IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| LOLITA MAGISANA, | ) | 8:11CV317 |
| | ) | |
| Plaintiff, | ) | MEMORANDUM AND ORDER ON |
| | ) | REVIEW OF THE FINAL DECISION OF |
| v. | ) | THE COMMISSIONER OF THE SOCIAL |
| | ) | SECURITY ADMININSTRATION |
| MICHAEL J. ASTRUE, Commissioner of | ) | |
| the Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Now before me is the Plaintiff Lolita Magisana's complaint, ECF No. 1, which was filed on September 20, 2011. Magisana seeks a review of the Commissioner of the Social Security Administration's decision to deny her applications for disability insurance benefits under Title II of the Social Security Act (the Act), see 42 U.S.C. §§ 401 et seq., and for Supplemental Security Income (SSI) benefits under Title XVI of the Act, 42 U.S.C. §§ 1381 et seq. See 42 U.S.C. §§ 405(g) and 1383(c)(3) (providing for judicial review of the Commissioner's final decisions under Titles II and XVI of the Act). The Commissioner has filed an answer to the complaint and a transcript of the administrative record. (See ECF Nos. 9-11.) In addition, the parties have filed briefs in support of their respective positions. (See Pl.'s Br., ECF No. 16; Def.'s Br., ECF No. 19; Pl.'s Reply Br., ECF No. 20.) I have carefully reviewed these materials, and I find that the Commissioner's decision must be affirmed.

## I.   BACKGROUND

On or about November 14, 2007, Magisana filed applications for disability insurance benefits and SSI benefits. (Transcript of Social Security Proceedings (hereinafter "Tr.") at 102-103, 169-175.) The applications were denied on initial review, (id. at 102-103, 108-112), and on reconsideration, (id. at 104-105, 118-122). Magisana then requested a hearing before an ALJ. (Id. at 129.) The hearing was held on May 17, 2010, (e.g., id. at 62), and, in a decision dated July 16,

1

2010, the ALJ concluded that Magisana was not entitled to benefits. (See id. at 39-61). Magisana requested that the Appeals Council of the Social Security Administration review the ALJ's decision. (See id. at 36-37.) This request was denied, (see Tr. at 1-5), and therefore the ALJ's decision stands as the final decision of the Commissioner.

## II.   SUMMARY OF THE RECORD

On a Disability Report form, Magisana claimed that she became disabled on August 2, 2005, due to fibromyalgia, depression, and anxiety. (Tr. at 199.) She was born in September 1973, (e.g., id. at 102); therefore, she was approximately 32 years old on the alleged onset date. Magisana completed three years of college, (id. at 205), and she has worked as an administrative assistant, receptionist, admissions evaluator, and data entry worker, (id. at 251).

### A.   Medical Evidence[1]

On May 31, 2005, Magisana visited Dr. Rugmini Warrier at the Creighton University Department of Medicine and reported fatigue, swollen lymph notes, and some sinus drainage. (Tr. at 374.) She also reported that her "anxiety symptoms" were improving with medication. (Id.) Dr. Warrier advised Magisana to continue taking certain medications and call if her symptoms change or intensify. (Id.) Magisana followed up with Dr. Warrier on June 23, 2005, and reported that her medication was making her fatigue and anxiety better, and she was "able to cope with work." (Id. at 373.)

On July 21, 2005, Magisana visited Dr. Warrier with several complaints, including polyarthralgia,[2] severe fatigue, muscle pain, body aches, malaise, weakness, and cramps. (Tr. at 370.) She reported that she was "unable to do her daily activities and [was] even thinking of stopping her work." (Id.) Dr. Warrier noted that Magisana had been taking Paxil in the past, but she

---

[1] This review of the medical evidence will focus on records dating back to approximately May 2005 and continuing to the date of the hearing before the ALJ. It emphasizes the records cited by the parties in their briefs.

[2] Polyarthralgia refers to pain in multiple joints. Stedman's Medical Dictionary 159, 1533 (28th ed. 2006).

2

switched to amitriptyline when Paxil proved ineffective.  (Id.)  He referred her to rheumatology for further evaluation and instructed her to continue taking amitriptyline.  (Id. at 371.)

Dr. John A. Hurley of the Creighton University Medical Center Division of Rheumatology examined Magisana on August 5, 2005.  (Tr. at 423-424.)  Dr. Hurley noted that Magisana had been experiencing "fatigue and diffuse myalgias and arthralgias" for about eight months and that "[t]his particular symptom complex is associated with significant fatigue but no true joint swelling."  (Id. at 423.)  His examination notes state,

> Musculoskeletal exam shows full range of motion of shoulders, elbows, wrists, and hands.  There are no nodules, vasculitic lesions or deformities.  She does, however, have pain with abduction especially of both shoulders.  Examination of the lower extremities reveals evidence of active disease in hips, knees, ankles, and feet.  There is some pain again on range of motion of the hips and knees.
>
> Trigger points are present in the mid trapezius areas, the spine of the scapulae, the lateral epicondyles, the upper outer quadrant of the buttock, the lateral trochanter and the medial fat pads of the knees.

(Id. at 424.)  Dr. Hurley diagnosed fibromyalgia, altered Magisana's medications (partly to "increase the restorative quality of her sleep"), and informed Magisana of "[t]he importance of exercise."  (Id.)

Magisana followed up with Dr. Warrier on or about August 23, 2005, and reported that her sleep was better, but her fatigue, malaise, and body ache persisted.  (Tr. at 369.)  She also reported that she quit working.  (Id.)  Dr. Warrier's notes indicate that Magisana's diagnoses were fibromyalgia and adjustment disorder.  (Id.)  It appears that changes were made to her medication regimen, and she was referred to "psych" for counseling.  (Id.)

Magisana saw Dr. Hurley on or about August 31, 2005.  (Tr. at 422.)  She reported that she has seen "mild improvement with sleep but still has pain," and she was "trying to exercise on a regular basis."  (Id.)  Dr. Hurley noted that Magisana "is doing somewhat better," and he made no changes to her medications.  (Id.)

Dr. Warrier examined Magisana on February 7, 2006.  (Tr. at 368.)  He noted that she "has got insurance back [and] wanted to [follow up] in clinic," and she "feels she still has fatigue [and] bodyaches."  (Id.)  She also reported a depressed mood and "less concentration," and she said she "would like to see Psych."  (Id.)  She was also "interested in joining [an] exercise program."  (Id.)

On February 8, 2006, Dr. Hurley noted that Magisana had "a lot of pain with the right

3

shoulder" and "some tenderness to palpation diffusely in upper and lower extremities," though he did not observe "much in the way of active synovitis in upper or lower extremities." (Tr. at 421.)[3] Magisana also reported that amitriptyline "seem[ed] to help with her sleep quite a bit." (Id.) Dr. Hurley continued Magisana on amitriptyline, started her on a new medication, and encouraged her "to pursue a regular program of exercise." (Id.)

On February 18, 2006, Dr. Matthew Bruner of Professional Medical Examiners LLC performed a consultative examination of Magisana. (Tr. at 279-287.) Magisana complained of pain, fatigue, impaired cognition, decreased mobility, poor sleep, and depression. (Id. at 279.) Dr. Bruner noted that Magisana appeared to be "in no apparent distress," was "in good mental state," and "appeared non-ill." (Id. at 283.) Although Magisana claimed that she was able to sit for approximately 10 minutes, (id. at 280), she "did sit continuously for approximately 25 minutes," (id. at 283). Dr. Bruner also noted that Magisana "was able to stand and walk on or off the table, up and down from the chair, and to and from the exam room with a little difficulty, albeit she did move somewhat slowly as if to convince me that she had pain." (Id. at 283. See also id. at 285 ("Questionable antalgic gait and is not consistent.") She had diffuse tenderness in her back and extremities "consistent with her fibromyalgia." (Id. at 285. See also id. ("Does have diffuse tender points consistent with her fibromyalgia.").) A mental status exam revealed "[n]ormal alertness, orientation, affect, thought content, judgment, and calculation," and Dr. Bruner noted that there were "no obvious signs of mental illness or retardation." (Id. at 286.) Dr. Bruner's diagnostic impressions were fibromyalgia and depression, and he noted,

> This 32-year-old female does have some impairment related to her fibromyalgia. She has a little relief with her etodolac and amitriptyline. She has been under the care of her rheumatologist named Dr. John A. Hurley. She is limited with pain and fatigue. She occasionally uses assistive devices. Cognitive impairment is likely related to her fibromyalgia and her depression. She responds appropriately to supervision and instructions in the clinical setting.

(Id. at 287.)

---

[3] Synovitis is "[i]nflammation of a synovial membrane, especially that of a joint." Stedman's Medical Dictionary 1920 (28th ed. 2006).

4

Davin Dickerson, APRN, a nurse practitioner at the Creighton Psychiatry Department, performed a psychiatric intake evaluation of Magisana on March 1, 2006. (Tr. at 409-410.) Magisana reported "that she has had recent difficulty with a depressed mood which has worsened over the past several months and has been ongoing at least since last summer," and that she has had "symptoms of increased isolation, increased irritability, easily frustrated [sic], crying easily, forgetfulness, and initial insomnia" which had improved somewhat due to medication. (Id. at 409.) She also reported fatigue and feelings of guilt. (Id.) Dickerson noted that Magisana "was casually and neatly dressed," that "[h]er hygiene appeared fair to good," that her "[s]peech was clear and fluent and logically directed," that her "affect was quite restricted and mood was depressed," that her "attention span, concentration, and memory were fair," that her "[m]otor activity was somewhat slow," and that her judgment and insight were fair. (Id. at 410.) Magisana was diagnosed with "Major depressive disorder single episode moderate" and "[h]istory of fibromyalgia and prior history of seizures," and she was assigned a GAF score of 54.[4] (Id.) She was ordered to begin taking Cymbalta and return "in two weeks for evaluation of medication effectiveness" and to "to discuss consideration of psychotherapy." (Id.)

On June 7, 2006, Magisana visited Dr. Hurley with complaints of constipation and diffuse pain since making a trip to New Orleans with family members. (Tr. at 420.) Upon examination, Dr. Hurley noted that Magisana was "alert and cooperative," that "[s]he really has no active synovitis in upper or lower extremities," and that "[s]he is tender in multiple trigger points." (Id.) Dr. Hurley directed Magisana to take medication to help with her constipation, but he "kept her amitriptyline the same." (Id.)

On June 13, 2006, Magisana visited Dr. Warrier and reported that "[h]er fatigue and body aches are better and she is able to sleep better," but she was struggling with constipation. (Tr. at 366.) Dr. Warrier concluded that "[i]t could be irritable bowel syndrome." (Id.) He prescribed

---

[4] "The GAF is a numeric scale ranging from zero to one hundred used to rate social, occupational and psychological functioning 'on a hypothetical continuum of mental health-illness.'" Pate-Fires v. Astrue, 564 F.3d 935, 937 n.1 (8th Cir. 2009) (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994)).

medications to relieve her constipation and abdominal discomfort, spoke with her about increasing fluid intake and eating a high-fiber diet, and instructed her to return in two weeks.  (Id. at 367.)

Magisana visited Dr. Hurley on September 6, 2006, and reported that she was doing "relatively well."  (Tr. at 419.)  She was receiving "herbal remedies" from a chiropractor, and she believed they were working.  (Id.)  She also had been walking three days per week for 25 minutes at a time.  (Id.)  A physical examination revealed "some tenderness at characteristic trigger points," but she had "full range of motion of all joints in [her] upper and lower extremities."  (Id.)  Dr. Hurley commented, "I think that Lolita is actually doing pretty well.  Her attitude is good and she is engaged in some walking and I have applauded and encouraged her to continue in that vein."  (Id.)

On November 7, 2006, Magisana arrived at the emergency room at the Creighton University Medical Center via ambulance.  (Tr. at 298.)  She reported that she was suffering from a headache that had been gradually increasing in severity over the past few days.  (Id.)  A CT scan revealed "[n]o acute intracranial process."  (Id. at 304.)  She was discharged after her pain improved, and she was referred to the neurology clinic for a follow-up  (Id. at 300, 302.)

Diana L. Kirby, MS, APRN, of the Creighton University Medical Center Department of Neurology examined Magisana on November 8, 2006.  (Tr. at 576-581.)  Magisana described her medical history to Kirby in detail, and she said that presently her "most bothersome symptoms are weakness of the right body and pain in the right shoulder and right flank."  (Id. at 577.)  Kirby's diagnostic impressions were "[m]ild weakness of the upper right extremity," "[f]atige," "[h]eadaches," "[h]istory of fibromyalgia," "[c]omplaints of pain in the right shoulder and right flank," "[c]omplaints of muscle spasms," "[h]istory of anemia," "[h]istory of epilepsy," "[c]omplaints of difficulty with memory," and "[h]istory of depression and anxiety."  (Id. at 580.)  Kirby ordered lab work to further evaluate Magisana's symptoms and noted, "If the lab work is within normal limits and fails to further explain any of her neurological complaints I would recommend getting MRIs of the cervical, thoracic, and lumbrosacral spine to look for any signs of demyelinating plague, pathological enhancement, or a disc herniation which could possibly be contributing to her symptoms."  (Id.)

On December 8, 2006, Magisana visited Dr. Warrier for a follow-up.  (Tr. at 363.)  Dr. Warrier noted that Magisana was suffering from fibromyalgia, constipation that was "probably

6

related to irritable bowel syndrome," "[i]ron-deficiency anemia," "[g]astroesophageal reflux," and "[s]ubjective right-sided weakness which is being evaluated by neurology." (Id. at 364.)  He described Magisana's treatment plan as follows:

1.    Due to significant iron-deficiency anemia, inability to tolerate iron medication, and a lot of GI symptoms, we will refer her to GI to evaluate for malabsorption as well as rule out celiac sprue.  This was discussed with the patient in detail.  We will also continue the stool regimen to relieve constipation.  Talked about fluids and high fiber diet.  I told her to bring all of the reports from outside lab to show to the GI specialist.

2.    Fibromyalgia.  She sees Dr. Hurley.  Continue Trazodone.

3.    Right sided subjective weakness currently being evaluated by neurology with MRI scan.  Blood work showed anemia but the rest of the workup was normal. . . .

(Id.)

An imaging study conducted in December 2006 revealed a "mild disc bulge with mild flattening of the thecal sac" at L5-S1, which was described as "[m]inimal degenerative disc disease." (Tr. at 307.)  An MRI of the thoracic spine revealed "[m]ild dextroscoliosis of the thoracic spine," (id. at 340), and another imaging study revealed "[m]ild multilevel degenerative changes of the cervical spine with mild kyphosis and disc herniation at C4-C5 disc level," (id. at 339).

A record dated March 30, 2007, states that Magisana had an initial evaluation for physical therapy on March 6, 2007, but she was not seen again until March 30 "due to insurance discrepancies." (Tr. at 329.)  She reported that she was performing stretches "consistently at home and . . . they have been helping," and her back pain had improved.  (Id.)  She was given new exercises, which she tolerated well, and scheduled for a return visit on April 10, 2007.  (Id.)  On April 10, Magisana reported for physical therapy and received more new exercises.  (Id. at 333.)  She tolerated these well, and she was advised to continue with her exercises.  (Id.)  A physical therapy progress note dated May 18, 2007, states that Magisana had not been seen since April 13, 2007, and her "[c]urrent status and progress toward goals [were] unknown." (Id. at 336.)  The note continues, "At time of last visit, the patient had only met one out of three short-term goals and had not yet achieved any of her long term goals. . . .  Discharge the patient from therapy services at this time." (Id.)

7

Dr. Hurley wrote a note dated April 26, 2007, stating,

> Ms. Magisana is followed for fibromyalgia.  She has not been seen since September 2006. She comes in today saying that she is now 19 weeks pregnant.  Her fibromyalgia is more active mainly because she thinks that she is not sleeping very well.  She was tried on Ambien but that has not helped.
>
> Because of the pain she also readily admits that she is not exercising as much as before.

(Tr. at 417.)  Dr. Hurley noted that Magisana was "tender in multiple areas," but "has no active synovitis."  He prescribed trazodone, "which is safe during pregnancy," and encouraged Magisana "to get back to a regular program of exercise."  (Id.)

Elizabeth Fitzpatrick, MD, resident psychiatrist at the Creighton Psychiatry Department, evaluated Magisana on May 24, 2007.  (Tr. at 404-406.)  Magisana reported that she had "a lot of conflicting ideas surrounding" her unexpected pregnancy.  (Id. at 404.)  She was tearful, anxious, and worried about finances, and she reported poor sleep, increased isolation, irritability, crying, poor concentration, and forgetfulness.  (Id.)  A mental status examination revealed fluent speech; anxious mood; depressed affect; logical and goal directed thinking; fair attention span, concentration, judgment, and insight; "somewhat impaired" short-term memory; and "somewhat slowed" motor activity.  (Id. at 406.)  Dr. Fitzpatrick diagnosed "[m]ajor depressive disorder recurrent moderate in severity without psychotic features, as well as generalized anxiety disorder and panic disorder"; "[f]ibromyalgia and prior history of seizure disorder"; "[m]oderate to severe" stress related to finances, pregnancy, and chronic medical issues; and "GAF currently 50 to 55."  (Id.)  She prescribed Laxapro and advised Magisana to return for a follow-up in two or three weeks.  (Id.)

On June 12, 2007, Magisana called Dr. Fitzgerald and reported that her depressive symptoms were continuing.  (Tr. at 403.)  Dr. Fitzgerald increased Magisana's Lexapro dosage and noted that she was due for a visit during the following week.  (Id.)

Magisana followed up with Dr. Fitzgerald on June 21, 2007.  (Tr. at 399-401.)  Magisana reported that she was doing fairly well, but she was still having difficulties with sleep.  (Id. at 399.)  She also continued to feel stress about how her pregnancy and the stress of caring for a fourth child would affect her fibromyalgia.  (Id.)  Dr. Fitzgerald diagnosed "[m]ajor depressive disorder recurrent, history of pospartum depression[,] [g]eneralized anxiety disorder as well as panic disorder";

8

"[f]ibromyalgia, patient is 28 weeks pregnant and prior history of seizure disorder"; "[m]oderate stressors"; and a GAF of 55.  (Id. at 401.)  Magisana was continued on Lexapro and trazodone and directed to follow up in three weeks.  (Id.)

On July 10, 2007, Magisana followed up with Dr. Fitzgerald and reported that her sleep was still disturbed, she was irritable in the evening, and she was continuing to worry about the pregnancy.  (Tr. at 398.)  Dr. Fitzgerald assigned a GAF score of 55, made adjustments to Magisana's medications, and directed her to follow up again in three weeks.

Magisana followed up with Dr. Hurley on July 19, 2007.  (Tr. at 416.)  Magisana reported that she was "having the usual fibromyalgia pain," and trazodone and pregnancy yoga were helping "somewhat but not as much as hoped."  (Id.)  Dr. Hurley noted tenderness in multiple trigger points but no active synovitis, and he indicated that Magisana "[w]ill try Flexeril but . . . will check this with her OB before initiating it."  (Id.)

On July 31, 2007, Magisana visited Dr. Fitzgerald and reported that she was doing "fairly well."  (Tr. at 397.)  She was excited for the upcoming delivery of her baby, but still had some ambivalence regarding the pregnancy.  (Id.)  She also continued to struggle with fibromyalgia symptoms.  (Id.)  Dr. Fitzgerald assigned a GAF score of 55-60, continued Magisana's medications, and directed her to follow up in three weeks.  (Id.)

Magisana visited Dr. Fitzgerald again on August 24, 2007.  (Tr. at 396.)  She reported that "bad food habits are creeping back in," and she appeared "more anxious about how she will handle the post-partum period."  (Id.)  Dr. Fitzgerald assigned a GAF score of 55 and directed Magisana to follow up in four weeks.  (Id.)

Magisana delivered her baby in early September 2007, (Tr. at 348), and was discharged from the hospital after two days, (id. at 342).

On September 27, 2007, Magisana followed up at the Creighton Psychiatry Department and reported that she was depressed but coping well despite periods of irritability and "easy tearfulness."  (Tr. at 395.)  She also reported that her energy level was low.  (Id.)  She was assigned a GAF score of 55.  (Id.)

On October 31, 2007, Magisana followed up with Dr. Hurley.  (Tr. at 415.)  Magisana reported that "[d]uring the first postpartum period [after giving birth to her son] she actually felt

quite well, but over the last several weeks she has noticed more pain." (Id.) Dr. Hurley examined Magisana and noted that she "has no active synovitis but is tender in multiple trigger points." (Id.) Dr. Hurley made adjustments to Magisana's medicine, "encouraged her to continue on her regular program of exercise," and advised her to "[r]eturn as necessary." (Id.)

Magisana followed up with Dr. Hurley again on December 7, 2007. (Tr. at 414.) She reported that she was "starting to notice some difficulty with aches and pains and because of her son, her sleep pattern is not normal." (Id.) Dr. Hurley noted that Magisana was "tender in multiple trigger points," but that she was "participating in a regular program of exercise including walking and yoga." (Id.) He advised her to take Motrin with meals. (Id.)

On or about December 9, 2007, Magisana's husband completed a "Supplemental Information Form." (Tr. at 208-210.) He indicated that Magisana "has great trouble with sleeping and often is awake at 4 a.m. or in bed much of the day"; that she takes care of children; that she attends church when she is physically able; that she engages in no evening activities; that she interacts "fine" with others unless her fibromyalgia flares up; that her grooming is "good," but showering is sometimes difficult and she sometimes needs assistance with certain tasks; that stress sometimes causes her to suffer fatigue and lose ability to concentrate; that her fibromyalgia has diminished her ability to adjust to changes; that "flares" severely impact her ability to concentrate; and that despite going to bed early and "staying in bed much of the day and night, she has trouble sleeping." (Id.) He wrote,

> Since the diagnosis, Lita has been unable to function as a normal person. Her fibromyalgia has made it impossible for her to continue with her plans of finishing college and having a career. Lita's fibromyalgia has been severe enough that we have had to take her to E.R. and call 911 more than once because of pain and inability to move.

(Id. at 210.)

On January 7, 2008, Rosanna Jones-Thurman, Ph.D., performed a consultative examination of Magisana. (Tr. at 433.) Magisana reported that she was depressed, anxious, and "has no motivation and has bad thoughts that run over and over in her head." (Id. at 435.) She added that she was "easily aggravated," "worries constantly about money," and has "a lot of memory problems and . . . 'fibro fog.'" (Id.) Magisana said that she takes her children to appointments, takes care of the baby while her husband works, irons clothes, and does the dishes. (Id. at 437.) She said she did

some laundry, but did not cook or do "major shopping." (<u>Id.</u>) She also reported that taking care of the baby "is often difficult and often a challenge." (<u>Id.</u>) Dr. Jones-Thurman noted,

> Ms. Magisana denies any restrictions of activities of daily living and does not appear to have such. She does not appear to have any difficulties in maintaining social functioning. She does not appear to have any recurrent episodes of deterioration when stressed, which result in withdrawal from the situation or an exacerbation of symptoms. She appears to be able to sustain attention and concentration for task completion, although she does have problems with attention and concentration at work. She appears to be able to understand and remember short and simple instructions, and could carry those out under ordinary supervision. She also appears to be able to relate appropriately to coworkers and supervisors and would be able to adapt to changes in her environment. She appears to be capable of managing her own funds.

(<u>Id.</u>) Later in her report, however, Dr. Jones-Thurman noted, "Ms. Magisana reported that she had previously managed her funds but is not able to do so any longer. She reports that she is too forgetful and has too many difficulties in this area. . . . Therefore, she had her husband take over. It does appear that she would have some difficulties if her memory is really bad." (<u>Id.</u> at 438-39.) Dr. Jones-Thurman diagnosed "Depressive Disorder, NOS," "[f]ibromyalgia, hypertension, and [irritable bowel syndrome]," and assigned a GAF of 59. (<u>Id.</u> at 438.)

Clayton B. Schroeder, M.D., performed a consultative physical examination of Magisana on January 21, 2008. (Tr. at 445.) Dr. Schroeder noted that Magisana's chief complaints were "[f]ibromyalgia with pain, fatigue, and muscle weakness"; "[t]rouble concentrating with short-term memory loss"; "[d]epression"; and "[d]ifficulty sleeping." (<u>Id.</u>) Magisana reported that "she can sit between 10 and 15 minutes, she can stand for 2 to 3 minutes, she can walk 100 feet, and she can only lie down for 10 minutes. She has to stop those activities because of pain and fatigue." (<u>Id.</u> at 446.) Dr. Schroeder's notes state, "During a typical day, she supervises her daughter preparing for school, she feeds her infant son, and she showers. She takes care of her children's school clothes, then she eats lunch, rests for the remaining [sic] of the day, and then spends time with her children and her husband when they get home from work and school." (<u>Id.</u> at 447.) During the examination, Magisana "sat continuously for 10 minutes. She did not use an assistive device. She stood and walked, got on and off of the exam table, and moved up and down from the chair with a lot of aching, groaning and acting like she was in pain." (<u>Id.</u> at 450.) Dr. Schroeder noted that Magisana's

"pain behavior is consistent with being an 8/10." (Id.)  He also noted that Magisana "has significant tenderness and guarding over all of her back," and "[s]he has multiple trigger points present along her shoulders, back, and hips." (Id. at 452.)  She also "had significant tenderness in all trigger points along her forearms, upper arms, thighs, and lower legs." (Id.)  Dr. Schroeder noted that Magisana had "no range of motion deficit," "has a normal gait and station," and "is able to tandem walk and walk on heels and toes without difficulty." (Id. at 453.)  Dr. Schroeder's report states,

> At this time, this claimant seems extremely limited in her ability to do any activities of daily living because of her significant pain syndrome.  She reports a lot of difficulty with everyday activities including standing, walking, climbing, crawling, and even caring for her infant son.  She reports that the child has to sit in a bowl chair or a swing for the majority of the day because she is unable to hold him.  She does not participate regularly in any exercise because of her significant pain.  Today, she exhibited no problems with handling objects, seeing, hearing, speaking, or following directions.  Her three-word recall was normal at three and 10 minutes with no difficulties.  She was able to fill out forms appropriately and had no difficulty doing this.  At this time, she was consistent with her pain complaints throughout the exam and does seem to be limited by her fibromyalgia in her ability to do any meaningful work at this time.  She did, however, sits [sic], stand, and follow directions with no difficulty, however, [she] did move around the exam room, groaning, and aching consistent with her level of pain rating.  She does not currently in [sic] any assistive device.

(Id. at 454.)

On February 27, 2008, Magisana visited Dr. Warrier for a follow-up.  (Tr. at 357.)  She reported that her constipation was better, and she was advised to continue taking her medications. (Id.)

Magisana returned to the Creighton Psychiatry Department on March 6, 2008.  (Tr. at 494.)  She presented with "acute exacerbation of gen. anxiety symptoms," but the treatment notes suggest that Magisana did not meet the criteria "for depression or mania." (Id.)  Adjustments were made to Magisana's medication, and she was directed to follow up within two weeks.  (Id.)  On March 18, 2008, Magisana reported experiencing side effects from one of her medications, and further adjustments were made to her medication regimen.  (Id. at 493.)

On March 21, 2008, Gerald Spethman, M.D., completed a "Physical Residual Functional Capacity Assessment" form based on Magisana's medical records.  (Tr. at 456, 463.)  Dr. Spethman concluded that Magisana could lift 20 pounds occasionally, lift 10 pounds frequently, stand and/or

walk for a total of about 6 hours in an 8-hour workday, sit for a total of about 6 hours in an 8-hour workday, and engage in unlimited pushing and pulling within the limits of her ability to lift.  (Id. at 457.)  He also concluded that Magisana could occasionally climb, balance, stoop, kneel, crouch, and crawl, and that she had no manipulative, visual, or communicative limitations.  (Id. at 458-460.)  In an addendum to his assessment, Dr. Spethman wrote,

> The claimant is partially credible as evidenced by this statement from Dr. Bruner at his C.E. of 2/18/2006 stating the claimant moved somewhat slowly as if to convince me that she has pain.  She also told the psychologist Dr. Thurman on 1/07/2008 that she takes the children and herself to the necessary appointments, that she takes care of her new baby while her husband is at work, that she irons clothes, does dishes, and does some errands, and she denied any restrictions of her ADL's. This is directly opposite to what she stated in her symptoms and ADL's.  Her C.E. from Dr. Schroeder on 1/21/2008 showed that her gait and straight leg raising were normal.  Also her sensation, coordination, muscle strength and tandem walking and heel to toe walking were also all normal.  The MER is consistent with a light RFC, and that RFC should begin at her AOD of 8/02/2005.  Her symptoms have waxed and waned as always with F.M., but it should be noted that she had a seven month period when she needed to see no doctor, and she of course had a nine month pregnancy from January of 2007 to September of 2007.  It should also be noted that none of her rheumatology exams during the entire time after the F.M. was diagnosed revealed any evidence of active synovitis, and at no time did she ever receive any trigger point injections.

(Id. at 464.)  On June 17, 2008, Jerry Reed, M.D., "reviewed all of the evidence in [the] file" and affirmed Dr. Spethman's conclusions.  (Id. at 502.)

On March 24, 2008, Christopher Milne, Ph.D., completed a "Psychiatric Review Technique" form based on Magisana's records.  (Tr. at 466.)  Dr. Milne determined that Magisana had a "medically determinable impairment" that did not "precisely satisfy the diagnostic criteria" for any affective disorders, but added that this impairment (i.e., "Depression, nos") was not severe.  (Id. at 466, 469.)  He concluded that Magisana's depression mildly restricted her activities of daily living and caused no difficulties in maintaining concentration, persistence, or pace, and that Magisana suffered no repeated episodes of decompensation of extended duration.  (Id. at 476.)  His "Consultant's Notes" state,

> Summary of self-report and other evidence: ADL's from the claimant indicate cares for children, husband handles money, attends church, cares for personal needs, and good grooming, prepares simple meals, and drive[s] car.  ADL's from others

13

indicate prepares some meals and husband others, visits others, cares for children, some laundry, watches television, attend church, fine socialization, good grooming, jewelry making, and takes meds.

Medical source opinion: Dr. Jones-Thurman, examining source, provides M-10 responses that reflect no significant psych limitations. Claimant is said to be able to maintain attention/concentration, to remember/understand/carry out short/simple instructions under ordinary supervision, to relate appropriately to coworkers/supervisors, and to adapt to changes in the work environment. This opinion is consistent with MSE and other findings, and is given considerable weight.

Evaluation, consistency, and credibility: Claimant allegations were partially consistent with the overall pattern of evidence. Examining source determines a depression disorder. . . . MSE shows well oriented, ability to receive, organize, analyze, remember, and express information appropriately, euthymic mood and affect, normal speech, no psychotic process, denies SI, insight and judgment above average, accurate calculations and spellings. Estimated GAF of 59 indicates only mild to moderate problems with overall functioning. Prognosis is said to be fairly good with continued treatment compliance. ADL's show some physical limitations yet adequate functioning otherwise.

Thus the overall pattern of evidence is not consistent with any allegations of severe psychological limitations.

(Id. at 478 (emphasis omitted).) On June 17, 2008, Rebecca Braymen, Ph.D., reviewed the evidence in the file and affirmed Dr. Milne's conclusions. (Id. at 500.)

Magisana visited the Creighton Psychiatry Department on April 14, 2008, and reported that she had better control over her anxiety. (Tr. at 492.) She was assigned a GAF score of "70+" and advised to follow up within two months. (Id.)

On May 8, 2008, Dr. Hurley completed a "Fibromyalgia Residual Functional Questionnaire." (Tr. at 508.) On this questionnaire, Dr. Hurley indicated that Magisana often experienced pain severe enough to interfere with her attention and concentration, and that she was moderately limited in her ability to deal with work stress. (Id. at 509.) He also indicated that Magisana could stand or walk for less than two hours at a time and sit for about two hours at a time; that she would "need to include periods of walking during an 8-hour day," and that she would "need a job which permits shifting positions at will from sitting, standing, or walking." (Id. at 510.) Dr. Hurley opined that Magisana could lift less than ten pounds frequently and could lift up to twenty pounds occasionally.

(Id.)  In addition, he opined that Magisana would miss work more than three times a month on average due to her impairments.  (Id. at 511.)

On May 28, 2008, Magisana visited Dr. Warrier with complaints of swelling lymph nodes. (Tr. at 356.)  It was noted that her mood was "OK" and her fibromyalgia was "stable."  (Id.)

Magisana visited the Creighton Psychiatry Department on June 12, 2008.  (Tr. at 560.)  She reported having "a high level of psychosocial stress over the last two weeks," citing "mom visiting, dad lost job, kids out of school, etc."  (Id.)  Increased stress was likely contributing to her insomnia, fatigue, and muscle tension.  (Id.)  However, she denied "significant problems with concentration, interest, motivation, [and] functioning."  (Id.)  She was assigned a GAF score of "70(+)" and directed to follow up in one month for medicine management.  (Id.)

Magisana returned to the Creighton Psychiatry Department for a follow-up on July 22, 2008. (Tr. at 559.)  She reported that her anxiety level had improved, but "multiple social stressors . . . continue to frustrate her."  (Id.)  She was assigned a GAF score of "70(+)," and directed to follow up again in two months.  (Id.)  No changes were made to her medications.  (Id.)

On October 7, 2008, Magisana returned to the Creighton Psychiatry Department and reported that she received "some relief" after declaring bankruptcy."  (Tr. at 558.)  She also reported, however, that she had been experiencing severe headaches for the past two weeks, and the headaches were negatively affecting her physical functioning.  (Id.  See also id. at 598.)  She was noted to have "continued anxious and mild depressive ideations," and her GAF score was reduced to 65.  (Id. at 558.)  Adjustments were made to her medication, and she was directed to return for a follow-up in one month.  (Id.)[5]

On October 28, 2008, Magisana reported left eye pressure, and Dr. K. John Burhan of Creighton Family Healthcare-Florence ordered an MRI of her head.  (Tr. at 594.)  The results of the MRI were "[u]nremarkable."  (Id. at 593.)

Magisana followed up with the Creighton Psychiatry Department on November 20, 2008. (Tr. at 557.)  She reported headaches, anxiety "focused around being in pain or fear of more pain," significant fatigue, and decreased productivity with her daily activities–though she was still

---

[5] It appears that a Dr. Burhan made additional adjustments to Magisana's medications on October 8, 2008.  (Tr. at 595.)

"attending to children."  (Id.)  She also reported that she would be seeing a new rheumatologist at the beginning of December.  (Id.)  Her GAF score was lowered to 60, adjustments were made to her medications, and she was directed to follow up within four weeks.  (Id.)

 On December 1, 2008, Magisana visited Eric Rome, M.D., at the Nebraska Medical Center Clarkson Hospital–University Hospital rheumatology clinic.  (Tr. at 551-553.)  Dr. Rome's assessment notes state,

> A 35-year-old female with a history of diagnosis of fibromyalgia in 2005 who comes into the office today with noted myofascial and musculoskeletal pain as well as weakness, comes in for a second opinion and reevaluation.  At this point in time, we spent a large amount of time educating the patient on fibromyalgia including the effects it has on daily life, lifestyle, care of her kids, as well as her ability to work.  We had come to the conclusion with the patient that we are going to try to get her back to work as much as possible.  The patient was in agreement with this.  We discussed the options including more consistent exercise regimen as well as working on the patient's sleep patterns and profile.  We will refer the patient for a sleep evaluation . . . .  We also will refer the patient for exercise therapy that will include massage and slowly bringing the patient up into mild aerobic exercise. . . .

(Id. at 552-553.)

On December 11, 2008, Magisana visited Michael Summers, M.D., at the Nebraska Medical Center Sleep Disorder Center.  (Tr. at 546-549.)  Dr. Summers determined that Magisana should be tested for obstructive sleep apnea.  (Id. at 546.)  He also noted that "[w]hether or not the patient's insomnia are due to maladapted sleep behaviors which she [has] incorporated into her routine over the years versus secondary to her underlying depression and anxiety which are not adequately controlled at this point is difficult to assess."  (Id.)  A physical exam revealed soft palate features that likely contributed to snoring, and Dr. Summers noted that although Magisana had "minimal daytime sleepiness as evidenced by her Epworth Sleepiness Scale of only 3, . . . she does report excessive fatigue throughout the day."  (Id. at 547.)  Dr. Summers instructed Magisana to change her bedtime from 8:30 p.m. to 10 p.m. and continue to wake at 6 a.m.  (Id. at 546.)

Magisana visited the Creighton Psychiatry Department on December 18, 2008, and reported anxiety, fatigue, and "warning signs" that her headaches might return.  (Tr. at 556.)  She denied "significant concentration problems."  (Id.)  She was assigned a GAF score of "60+" and adjustments were made to her medications.  (Id.)

16

On January 7, 2009, Magisana completed a sleep study at the Sleep Disorder Center. (tr. at 543.) The study "demonstrate[d] no evidence of sleep disordered breathing, periodic limb movements, or increased upper airway resistance. Occasional snoring was noted but did not cause significant sleep fragmentation." (Id. at 545.) The Sleep Lab Report states,

> No sleep disorder was found on this study sufficient to explain the extent of the patient's presenting symptoms. The patient does have a history of fibromyalgia which subjectively she says is not well controlled. In addition, she does have depression and anxiety which also needs to be adequately controlled. If asked [sic] her working with these two aspects of her health there [are] still persistent issues with fatigue and her sleepiness [a] further evaluation may be required . . . ."

(Id.) On or about February 12, 2009, Dr. Summers reviewed these results along with Magisana's subjective complaints, and he assessed Magisana with "[d]isorders of both initiation and maintenance of sleep," prescribed medication to be taken 30 minutes before bedtime, and directed Magisana to follow up in four to six weeks. (Id. at 539-540.)

On March 30, 2009, Magisana visited Michael Feely, M.D., at the Nebraska Medical Center Clarkson Hospital–University Hospital rheumatology clinic. (Tr. at 537-538.) Magisana reported that she was feeling "approximately 15% better than at the time of [her] last visit," that her headaches were under better control, that the medicine she received from the Sleep Clinic was helping her "achieve no restless sleep," that "therapy at Horizon Spine" was helpful, and that she was hoping to initiate an exercise program. (Id. at 537.) An examination revealed tenderness "at nearly all of the fibromyalgia trigger points, but also at neutral points such as mid-thigh." (Id. at 538.) Magisana was encouraged to continue with her therapies and advised to return in six months. (Id.) Sometime thereafter, Magisana followed up at the Creighton Psychiatry Department and received a GAF score of 65-70. (Id. at 555.)[6]

Edward A. Horowitz, M.D., F.A.C.P., of the Creighton University Department of Medicine wrote a letter to Magisana's attorney dated July 31, 2009. (Tr. at 562.) Dr. Horowitz wrote that he saw Magisana on January 27, 2009, and February 25, 2009, and he noted that Magisana "was

---

[6] The date on this particular record is not legible. The Commissioner states in his brief that this particular consultation occurred on May 12, 2009. (See Def.'s Br. at 12, ECF No. 19.)

previously seen by [his] former partner, Dr. Rugmini Warrior [sic]."  (Id.)  Dr. Horowitz's letter continues,

> I did not address any issues of disability on the two times I saw her.  I do not recall, from memory or from my examination, any obvious physical disability, such as limitation of strength or range of motion.  Her history and symptoms are certainly suggestive of the so-called fibromyalgia syndrome.  I have no objective data on her ability to concentrate on mental tasks.

(Id.)  The letter also suggests that the results of the sleep study, which were not available to Dr. Horowitz, "would be of extreme interest" because obstructive sleep apnea "could certainly account for many of her symptoms and is very treatable."  (Id.)

Magisana returned to the Creighton Psychiatry Department on September 16, 2009, and reported that she was very busy with six kids in the home ranging in age between two and fourteen years.[7]  (Tr. at 565.)  It appears that Magisana was assigned a GAF score of 50-60, and that adjustments were made to her medications.  (Id.)

On January 14, 2010, Magisana visited the emergency room at the Creighton University Medical Center with complaints of abdominal pain.  (Tr. at 609.)  She was discharged with instructions to take Ibuprofen and to return if her condition worsened.  (Id. at 610-611.)  On January 19, 2010, Magisana followed up at the Creighton University Women's Health Center and reported that her abdominal pain was still present, but better.  (Id. at 608.)  An ultrasound examination revealed a pocket of "cul de sac fluid" that was likely causing the pain.  (Id. at 605.)  She was prescribed medication and directed to follow up in one week for a blood pressure check.  (Id.)

Yetunde Ogunleye, M.D., who had been seeing Magisana at the Creighton Psychiatry Department since May 2009, completed a "Psychiatric Evaluation Form for Affective Disorders" and a "Mental/Emotional Capacity Analysis for Sustained Work Activity" on February 5, 2010.  (Tr. at 635-645.)  Dr. Ogunleye indicated that Magisana's current diagnoses were major depressive disorder – recurrent and generalized anxiety disorder.  (Id. at 637.)  Dr. Ogunleye also indicated that Magisana had no impairments in daily living activities, no impairments in social functioning, and

---

[7] It appears that Magisana's four biological children were joined by two foster children. A record dated November 16, 2009, indicates that one foster daughter was removed, leaving a total of five children in Magisana's home.  (Tr. at 564.)

18

did not "have a medically documented history of chronic Affective Disorder of at least 2 years duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or sighs currently attenuated by medication of psychosocial support [sic]." (Id. at 639-641.) Dr. Ogunleye added that Magisana's "concerns are usually about fibromyalgia and not depression." (Id. at 641.) In addition, Dr. Ogunleye noted that Magisana's ability to adjust to a job was good, her ability to adjust personally and socially was good, and that her ability to understand, remember, and carry out simple job instructions was good. (Id. at 643-644.)

On February 9, 2010, Magisana visited Devin Fox, M.D., "to establish a new primary care physician." (Tr. at 629.) Following an examination, Dr. Fox diagnosed hypertension, ovarian cysts, chronic headaches, heavy periods, and fibromyalgia. (Id.) Dr. Fox's note states, "I think things are under decent control. She really had no active problems. She just needed a refill on her [medications] . . . ." (Id.) Magisana was directed to follow up in two months. (Id.)

Magisana visited Dr. Ogunleye at the Creighton Psychiatry Department on February 16, 2010. (Tr. at 647.) Dr. Ogunleye's record, which is largely illegible, appears to indicate that Magisana was assigned a GAF score of 55-60. (Id.)

On February 18, 2010, Dr. Amy Cannella completed a "Fibromyalgia Residual Functional Questionnaire." (Tr. at 617-620.) Dr. Cannella indicated that she saw Magisana between December 1, 2008, and March 30, 2009. (Id. at 617.) She identified Magisana's symptoms, indicated that her "flares are intermittent," and indicated that Magisana "reports pain all over." (Id. at 617-618, 620.) She did not comment upon Magisana's ability to sit, stand, walk or work, however. (Id. at 618-620.)

Magisana visited Dr. Cannella on April 1, 2010. (Tr. at 651.) Magisana reported that "she had actually improved quite a bit" since her last visit, "but . . . she has had a really rough winter." (Id.) More specifically, she reported that her fibromyalgia was exacerbated by dry socket (following a pulled tooth) and a burst ovarian cyst. (Id.) She also told Dr. Cannella that she was feeling exhausted despite sleeping eight hours per night. (Id.) In addition, Magisana reported that arguing among her own children and among two foster children–one of whom later left the home–caused her stress, and she discontinued her exercise program and her Horizon Spine Fibromyalgia Program. (Id.) Dr. Cannella made changes to Magisana's medications, ordered tests, and noted that Magisana would follow up with Dr. Summers to address her sleep. (Id. at 652-653.)

19

Magisana visited Brimal Patel, M.D., at the sleep clinic on April 2, 2010.  (Tr. at 649-650.)
Dr. Patel wrote,

> This patient has hypersomnolence which is most likely secondary to her other multiple cofactors such as fibromyalgia and/or depression-anxiety issues.  Therefore at present, we will recommend the patient to continue management as per her rheumatologist for her fibromyalgia as it is imperative that her pain is optimally controlled to help her get more restful sleep so that she is not hypersomnolent during the daytime.  Furthermore, there has been no change from Flexeril to Neurontin. This will hopefully help somewhat with her fatigue during the daytime as well.  The other issues that could be contributing to her hypersomnolence would be depression which although she believes is well controlled on her current therapy, we will still recommend the patient to follow up with her psychiatrist for further clinical correlation and therapeutic intervention.  She furthermore has anxiety which seems to have flared up since December 2009 as well as having symptoms of anxiety, and therefore we recommend the patient to increase the dose of clonazepam . . . and have her follow up with her psychiatrist as soon as possible for further clinical correlation and therapeutic intervention if necessary.

(Id. at 650.)

On April 14, 2010, Magisana visited Dr. Ogunleye, who assigned her a GAF of 45-50 and made adjustments to her medications.  (Tr. at 634.)

## B.   Magisana's Testimony

During the hearing before the ALJ on May 17, 2010, Magisana testified that she was 36 years old and had completed three years of college.  (Tr. at 68.)  She had four children ranging in age from twelve to two, and she cared for two foster children between July 2009 and March 2010.  (Id. at 69-70.)[8]  She said she "worked fairly steadily from the age of 21," with "some gaps in between there for . . . children being born."  (Id. at 71.)  Her work has been in "receptionist/administrative assistant-type job[s], which required a lot of organization, a lot of attention to detail, [and] a lot of mental and physical abilities."  (Id. at 71-72.)  After leaving New Orleans and moving to Omaha, Magisana worked as an enrollment specialist at the University of Nebraska at Omaha between November 2004

---

[8] More specifically, Magisana testified that she cared for one of the foster children between July 2009 and October 2009, and for the other between July 2009 and March 2010.  (Tr. at 70.)  She also explained that she did not apply to be a foster parent, that she knew the children's biological parents, and that the children were placed with her and her family in "an emergency placement" that was expected to last only one to three months.  (Id. at 70-71.)

20

and August 2005. (Id. at 73.) The job ended when Magisana became physically exhausted and began "missing a lot of work." (Id.) The ALJ asked Magisana why she was unable to "go back to doing some kind of clerical work if you can supervise a household with all these kids," and Magisana responded,

> Well, the supervision that I give my children is pretty lax. I'm not able to get down on the floor and play with them or take them to soccer practice or all of those things. I don't manage the bills. My husband does. I don't really go grocery shopping much anymore. Basically what I do with the kids at home is make sure they're fed, make sure they're clothed and make sure they've taken a bath. Other than that, I have to kind of pick and choose the activities that I can do with them.

> . . . Fatigue and pain are pretty constant and it's very unpredictable when a flare is going to show up. Just on a daily basis, say this past week, . . . there have been three days when I have not taken a shower because it was - - I was too exhausted to do so. I do not take baths because it's too difficult to get into the tub and get out. The organizational skills that I used to have are pretty - - I think they've come down considerably. I can't keep track of anything.

(Id. at 77-78.) She added that she has seen some improvements since obtaining treatment, but "it's still touch and go at times." (Id. at 79.) She does not drive very far, does not prepare meals, and does not make the children's beds. (Id. at 79-80.) She does dress her children on occasion, and if she is "feeling okay," she can wash dishes, do laundry, dust, and sweep. (Id. at 80.) She said she can walk for about ten or fifteen minutes, and that sitting "becomes very painful" after an unspecified time. (Id. at 81.) She added that she could only sit and focus for about 30 minutes. (Id. at 83.) Magisana also testified that her youngest child is now in daycare, so on ordinary days she does not have any children at home. (Id. at 84, 86.) Magisana said that when her health is good, she has four good days per week. (Id. at 90.) On bad days , she feels heaviness, weakness, and pain, and she usually stays "at home, on the sofa, with no sound" and with the "phone cut off" if possible. (Id.)

Magisana testified that she has sought psychiatric assistance in the past due to the "devastation, frustration, anger and . . . guilt" she felt about being limited by her fibromyalgia. (Tr. at 93-94. See also id. ("I prided myself on being the . . . caretaker of my home and it was, and it still is, very heartbreaking to know that I, I probably won't ever be the mom I thought . . . I should be . . . .").) She said that psychiatric treatment has helped, but her depression increases and decreases in tandem with her fibromyalgia symptoms. (Id. at 94.)

21

### C.    The Vocational Expert's Testimony

The ALJ asked a Vocational Expert (VE), Steven Schill, to consider a "younger worker with a high school, plus three-year college education," with past work as an administrative assistant, receptionist, admissions evaluator and data entry worker, and who "could occasionally lift or carry 20 pounds; frequently lift or carry 10 pounds; stand, sit or walk for six hours in an eight-hour day; could occasionally do all postural activities, climb, balance, stoop, kneel, crouch [and] crawl; should avoid concentrated exposure to cold, heat[,] wetness, humidity, vibration and hazards." (Tr. at 98.) The ALJ then asked the VE whether this person could return to all of her past work, and the VE responded affirmatively. (Id.) The ALJ next asked, "The second question would be sedentary work, if she shouldn't lift or carry over ten pounds, not be on her feet more than two hours in an eight-hour day, and the rest of the first hypothetical has been carried over. Could she still do all of her past work?" (Id.) The VE responded affirmatively. (Id. at 99.) The ALJ then asked, "if I were to reduce her functional capacity to unskilled work, just SVP: 1/2, routine work at the sedentary or light level, with that functional capacity, could she - - she couldn't do her past work, but . . . could she perform the full range of unskilled, light and sedentary work?" (Id.) Again, the VE responded affirmatively. (Id.) The ALJ then asked whether there was "anything in [Magisana's] testimony that would cause you to doubt whether she could do her past work or even unskilled, light or sedentary work?" and the VE responded, "I was concerned of the fact that she states that she needs to take frequent breaks during the day of extended period[s] of time. That would not be conducive for her to handle a full-time employment, 40-hour[s]-a-week, based on her testimony." (Id. at 99.)

Magisana's attorney asked the VE whether the limitations assessed by Dr. Hurley, including his assessment that Magisana's "impairments . . . and/or treatment would cause her to be absent from work more than three times a month," would preclude all employment, and the VE responded affirmatively. (Tr. at 99.)

### D.    The ALJ's Decision

An ALJ is required to follow a five-step sequential analysis to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520(a); id. § 416.920(a). The ALJ must continue the analysis until the claimant is found to be "not disabled" at steps one, two, four or five, or is found to be "disabled"

22

at step three or step five. See 20 C.F.R. § 404.1520(a); id. § 416.920(a). In this case, the ALJ found Magisana to be not disabled at step four. (See Tr. at 44-55.)

Step one requires the ALJ to determine whether the claimant is currently engaged in substantial gainful activity. See 20 C.F.R. § 404.1520(a)(4)(i), (b); id. § 416.920(a)(4)(i), (b). If the claimant is engaged in substantial gainful activity, the ALJ will find that the claimant is not disabled. See 20 C.F.R. § 404.1520(a)(4)(i), (b); id. § 416.920(a)(4)(i), (b). In the instant case, the ALJ found that Magisana "has not engaged in substantial gainful activity since August 2, 2005, the alleged onset date." (Tr. at 44 (citation omitted).)

Step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. § 404.1520(c); id. § 416.920(c). A "severe impairment" is an impairment or combination of impairments that significantly limits the claimant's ability to do "basic work activities and satisfies the "duration requirement." See 20 C.F.R. § 404.1520(a)(4)(ii), (c); id. § 404.1509 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months."); id. § 416.920(a)(4)(ii), (c); id. § 416.909. Basic work activities include, inter alia, "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[u]nderstanding, carrying out, and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers and usual work situations"; and "[d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b); id. § 416.921(b). If the claimant cannot prove such an impairment, the ALJ will find that the claimant is not disabled. See 20 C.F.R. § 404.1520(a)(4)(ii), (c); id. § 416.920(a)(4)(ii), (c). Here, the ALJ found that Magisana "has the following severe impairment: fibromyalgia." (Tr. at 44 (citation omitted).)

Step three requires the ALJ to compare the claimant's impairment or impairments to a list of impairments. See 20 C.F.R. § 404.1520(a)(4)(iii), (d); id. § 416.920(a)(4)(iii); see also 20 C.F.R. Part 404, Subpart P, App'x 1. If the claimant has an impairment "that meets or equals one of [the] listings," the analysis ends and the claimant is found to be "disabled." See 20 C.F.R. § 404.1520(a)(4)(iii), (d); id. § 416.920(a)(4)(iii). If a claimant does not suffer from a listed impairment or its equivalent, then the analysis proceeds to steps four and five. See 20 C.F.R. § 404.1520(a); id. § 416.920(a). In this case the ALJ found that Magisana "does not have an

23

impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (Tr. at 47 (citations omitted).)

Step four requires the ALJ to consider the claimant's residual functional capacity (RFC)[9] to determine whether the impairment or impairments prevent the claimant from engaging in "past relevant work." See 20 C.F.R. § 404.1520(a)(4)(iv), (e), (f); id. § 416.920(a)(4)(iv), (e), (f). If the claimant is able to perform any past relevant work, the ALJ will find that the claimant is not disabled. See 20 C.F.R. § 404.1520(a)(4)(iv), (f); id. § 416.920(a)(4)(iv), (f). The ALJ concluded that Magisana "has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except as follows: The claimant can occasionally lift and carry 20 pounds; and frequently lift and carry 10 pounds. She can stand, sit, or walk for 6 hours out of an 8 hour day. The claimant can occasionally perform postural activities (climb, balance, stoop, kneel, crouch, and crawl) but should avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, vibrations, and hazards." (Tr. at 48.) The ALJ added, "The claimant is capable of performing past relevant work as an administrative assistant, receptionist, data entry clerk, and admission evaluator. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity." (Id. at 54 (citations omitted).) Because the ALJ found that Magisana was not disabled at step four, the ALJ did not proceed to step five of the sequential analysis. (See id. at 54-55.)

### III.   STANDARD OF REVIEW

I must review the Commissioner's decision to determine "whether there is substantial evidence based on the entire record to support the ALJ's factual findings." Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997) (quoting Clark v. Chater, 75 F.3d 414, 416 (8th Cir. 1996)). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008) (citations and internal quotation marks omitted). A decision supported by substantial evidence may not be

---

[9] "'Residual functional capacity' is what the claimant is able to do despite limitations caused by all of the claimant's impairments." Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)). See also 20 C.F.R. § 416.945(a).

reversed, "even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome." McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010). Nevertheless, the court's review "is more than a search of the record for evidence supporting the Commissioner's findings, and requires a scrutinizing analysis, not merely a 'rubber stamp' of the Commissioner's action." Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008) (citations, brackets, and internal quotation marks omitted). See also Moore v. Astrue, 623 F.3d 599, 602 (8th Cir. 2010) ("Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision.").

I must also determine whether the Commissioner's decision "is based on legal error." Lowe v. Apfel, 226 F.3d 969, 971 (8th Cir. 2000). No deference is owed to the Commissioner's legal conclusions. See Brueggemann v. Barnhart, 348 F.3d 689, 692 (8th Cir. 2003).

## IV.   ANALYSIS

Magisana argues that the Commissioner's decision must be reversed because 1) "The ALJ erroneously rejected the treating source and consultant opinions regarding the Plaintiff's limitations"; 2) "The ALJ erroneously found not credible the Plaintiff's hearing testimony and written statements by her and her husband and therefore formulated an incorrect RFC"; and 3) "Finding the claimant's depression to be nonsevere was an error and led to incomplete hypothetical questions posted to the VE." (Pl.'s Br. at 13, ECF No. 16.)  I shall analyze each of her arguments in turn.

### A.   The ALJ's Discrediting of Certain Medical Source Opinions

Magisana argues that the ALJ erred by "cherry picking" records that "supported a negative finding, while ignoring the rest." (Pl.'s Br. at 17, ECF No. 17.)  She adds that in so doing, the ALJ ignored "favorable opinions from both treating and consultant sources" in violation of the applicable regulations. (Id. at 14.)

"The Commissioner must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000). Although the ALJ must develop the record fully and fairly, he or she "is not required to discuss every

25

piece of evidence submitted." Wildman v. Astrue, 596 F.3d 959, 966 (8th Cir. 2010) (quoting Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998)).

When weighing the opinions of medical sources, the Commissioner will generally give more weight to the opinion of a source who has examined the claimant. See 20 C.F.R. § 404.1527(c)(1); 20 C.F.R. § 416.927(c)(1). The opinions of treating sources, too, generally receive substantial weight. See Casey v. Astrue, 503 F.3d 687, 691 (8th Cir. 2007); 20 C.F.R. § 404.1527(c)(2); 20 C.F.R. § 416.927(c)(2); SSR 96-2p, 1996 WL 374188 (July 2, 1996). Indeed, the Commissioner will give a treating source's opinion about the nature and severity of a claimant's impairment "controlling weight" if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); 20 C.F.R. § 416.927(c)(2). See also SSR 96-2p. Conversely, "[a]n ALJ may 'discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.'" Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000)). In addition, medical source opinions that are supported by relevant evidence, that are consistent with the record as a whole, and that are made by specialists receive relatively greater weight. 20 C.F.R. § 404.1527(c)(3)-(5); 20 C.F.R. § 416.927(c)(3)-(5).

Magisana argues first that the ALJ "cherry pick[ed] the record" by citing Dr. Bruner's findings "that he did not see any distress in the Plaintiff, she did not 'appear ill,' and she was able to sit continuously for 25 minutes," while failing "to cite his other findings . . . that the Plaintiff was 'limited with pain and fatigue.'" (Pl.'s Br. at 17, ECF No. 16.) In response, the Commissioner argues that "the ALJ's decision shows that she believed Plaintiff suffered from fibromyalgia, which caused significant limitations. Thus, it is hard to see how the ALJ's failure to cite to Dr. Bruner's relatively vague statement about pain and fatigue amounted to 'cherry picking' the record . . . ." (Def.'s Response Br. at 24, ECF No. 19.) I agree with the Commissioner. It is true that the ALJ failed to make a specific reference to Dr. Bruner's comment about Magisana's pain and fatigue, but I am not persuaded that the ALJ ignored or disregarded Dr. Bruner's comment. The ALJ cited Dr. Bruner's report and discussed it in detail; thus, it is highly unlikely that she failed to consider his

statement that Magisana "is limited with pain and fatigue." Indeed, the ALJ found specifically that Magisana's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," including "pain, weakness, and fatigue." (Tr. at 50.) Although the ALJ ultimately determined that Magisana's pain and fatigue did not prevent her from resuming work, it cannot be said that the ALJ ignored evidence that Magisana was limited with pain and fatigue. Under the circumstances, the ALJ's failure to discuss Dr. Bruner's general comment that Magisana "is limited with pain and fatigue" was not erroneous.

Magisana also argues that the ALJ erred by failing to cite Dr. Bruner's finding that Magisana's "[c]ognitive impairment is likely related to her fibromyalgia and her depression." (Pl.'s Br. at 17, ECF No. 16.) In response, the Commissioner argues that Dr. Bruner "mentioned 'cognitive impairment' based on Plaintiff's complaints, not because he observed this symptom." (Def.'s Response Br. at 24, ECF No. 19.) The Commissioner adds, "Although the 'neuropsychiatric' portion of Dr. Bruner's examination addressed Plaintiff's mental functioning, his findings in this area did not indicate cognitive impairment. To the contrary, Dr. Bruner found that Plaintiff had '[n]ormal alertness, orientation, affect, thought content, judgment, and calculation,' and 'no obvious signs of mental illness or retardation.' If anything, Dr. Bruner's report tended to <u>disprove</u> cognitive impairment." (Id. (emphasis in original).) I see no error in the ALJ's failure to cite Dr. Bruner's comment that Magisana's self-reported decrease in cognitive function was likely related to her fibromyalgia and her depression. The ALJ noted that Magisana reported "impaired cognition" to Dr. Bruner and that Dr. Bruner diagnosed Magisana with both fibromyalgia and depression. (Tr. at 50-51.) This was sufficient.

Next, Magisana argues that the ALJ erred by ignoring or rejecting portions of Dr. Hurley's functional assessment of May 8, 2008. (Pl.'s Br. at 17-18, ECF No. 16.) More specifically, she states,

> Dr. Hurley said that the illness OFTEN would cause an experience of pain sufficiently severe to interfere with the Plaintiff's attention and concentration; that she would be able to sit continuously for less than two hours; that she would be able to stand/walk continuously for about 2 hours; and that her ability to use hands, fingers and arms for repetitive activities would be limited [to] 25% of the work day. Any of these limitations would rule out even sedentary work. Dr. Hurley also stated that emotional factors contribute to the severity of her symptoms and functional

27

> limitations and he rated her overall difficulty with maintaining concentration to be
> at a moderate level.  In addition, he opined that she would be absent more than three
> times per month due to her illnesses or the treatment of her condition.  Again, this
> limitation alone would preclude all full time work.

(Id. (citations omitted) (emphasis in original.)

Dr. Hurley is a treating physician; therefore, the ALJ was required to provide "good reasons" for discounting his opinions.  Davidson v. Astrue, 501 F.3d 987, 990 (8th Cir. 2007) (citing Dolph v. Barnhart, 308 F.3d 876, 878 (8th Cir. 2002)).  The ALJ wrote,

> Dr. Hurley's opinions regarding the claimant's ability to lift 20 pounds occasionally,
> and 10 pounds frequently are given great weight because those opinions are
> consistent with other substantial evidence in [the] record.  The other aforementioned
> opinions provided by Dr. Hurley are given little weight as his own reports fail to
> reveal the type of significant clinical abnormalities that one would expect if the
> claimant were in fact limited to such a degree and his office notes do not support
> such conclusions.  Additionally, the treatment that Dr. Hurley has provided for the
> claimant has essentially been routine and conservative in nature which is not the kind
> of treatment one would expect if the claimant were truly as limited as he has
> reported.

(Tr. at 52.)  Thus, the ALJ provided two reasons for discounting some of Dr. Hurley's opinions: 1) the opinions are not consistent with other evidence in the record (i.e., Dr. Hurley's own treatment notes); and 2) the opinions are not consistent with the routine, conservative treatment that Dr. Hurley provided to Magisana.

It is well-established that an ALJ may discount a treating physician's opinion based on "an appropriate finding of inconsistency" between the opinion and other substantial evidence in the record.  See, e.g., Goff v. Barnhart, 421 F.3d 785, 790-91 (8th Cir. 2005).  See also id. at 790 ("An ALJ may 'discount or even disregard the opinion of a treating physician . . . where a treating physician renders inconsistent opinions that undermine the credibility of such opinions."); 20 C.F.R. § 404.1527(c)(2), (4); 20 C.F.R. § 416.927(c)(2), (4).  Here, the ALJ reviewed of Dr. Hurley's treatment records and correctly noted that there is little evidence of pain "on range of motion," there were few signs of "active synovitis," and Magisana's complaints mainly involved "diffuse" pain or pain in "trigger points."  (See id. at 50-51.)  As noted above, the ALJ then concluded that some of Dr. Hurley's opinions would be discounted because his treatment records do not "reveal the type of significant clinical abnormalities one would expect if the claimant were in fact limited to such a

degree." (Tr. at 52.) After carefully reviewing the ALJ's decision, along with the entire record, I am persuaded that the ALJ committed no error. In <u>Davidson v. Astrue</u>, 501 F.3d 987, 990 (8th Cir. 2007), the Eighth Circuit found that an ALJ had "good reasons" for discounting a treating physician's conclusions about a claimant's RFC when the physician's treatment notes "contain[ed] few hints of the serious physical limitations that [the physician] would latter attribute to [the claimant]," but suggested instead that the claimant suffered "from no more than moderate knee pain and made slow but steady progress in her rehabilitation efforts." Similarly, Dr. Hurley's treatment notes do not suggest that Magisana suffered from the sort of serious limitations in her abilities to sit, stand, walk, use her upper extremities, and concentrate that he later described on the assessment form. Nor do the notes suggest that Magisana's symptoms were so serious that she would miss more than three days of work per month. It was therefore appropriate for the ALJ to give reduced weight to those opinions.

I also find that the ALJ appropriately discounted Dr. Hurley's opinions due to the conservative nature of the treatment that he provided to Magisana. As the ALJ correctly noted, Dr. Hurley merely prescribed medication for Magisana and advised her to exercise, and Magisana's visits with Dr. Hurley were often separated by several months. (<u>See</u> Tr. at 50-51.) Also, Dr. Hurley never placed any restrictions on Magisana's activities. I agree with the Commissioner that "[t]hese modest treatment recommendations did not indicate [the presence of] disabling physical limitations." (Def.'s Br. at 26, ECF No. 19.) I also find that the frequency of Magisana's visits with Dr. Hurley do not support his opinion that she would likely miss more than three days of work per month for treatment.

In her reply brief, Magisana argues that the effects of fibromyalgia "can wax and wane," and this "explains why the Plaintiff, like many patients, has at times received minimal or sporadic treatment." (Pl.'s Reply Br. at 2, ECF No. 20.) Even if the waxing and waning of symptoms is characteristic of fibromyalgia, however, it was appropriate for the ALJ to consider the frequency of Magisana's treatment when weighing Dr. Hurley's opinions. <u>See</u> 20 C.F.R. § 404.1527(c)(2)(i)-(ii); 20 C.F.R. § 416.927(c)(2)(i)-(ii).

Magisana also argues that evidence showing that she had full range of motion, normal muscle strength, normal gait, and no active synovitis does not support the ALJ's decision to discredit Dr.

Hurley's testimony because "none of these factors are elements in the diagnosis of fibromyalgia[,] and none were symptoms or problems reported by the Plaintiff." (Pl.'s Reply Br. at 3, ECF No. 20.) This argument is not persuasive. The ALJ found that Magisana suffered from fibromyalgia; the diagnosis is not in dispute. Magisana's RFC is at issue, (see Tr. at 48-54), and it was appropriate for the ALJ to focus on Magisana's symptoms (or lack thereof) when determining whether her impairments limited her ability to work. See, e.g., 20 C.F.R. § 404.1545; 20 C.F.R. § 416.945. I cannot say that it was erroneous for the ALJ cite the absence of the aforementioned symptoms when discounting some of the relatively severe limitations cited by Dr. Hurley in his assessment. In short, I find that the ALJ provided "good reasons" for discounting Dr. Hurley's opinions, and therefore she did not err by giving little weight to them.

Magisana argues next that the ALJ erred by highlighting "Dr. Cannella's refusal to complete specific assessment sections" on the form dated February 18, 2010. (Pl.'s Br. at 18, ECF No. 16.) This argument is without merit. The ALJ did nothing more than correctly note that "Dr. Cannella was not willing to give a functional assessment regarding the limitations that the claimant's condition places on her." (Tr. at 52. See also id. at 618-620.) This was not erroneous.

Magisana notes in passing that "[t]he ALJ rejected the findings of a consultative examination by Clayton Shroeder [sic], MD because she believed Dr. Shroeder's [sic] report contracted [sic] 'sharply with other evidence in the record,' rendering his findings 'less persuasive.'" (Pl.'s Br. at 13, ECF No. 16 (citations omitted).) I take it that Magisana means to argue that the ALJ erred by discrediting Dr. Schroeder's finding that she "was extremely limited in her ability to do any activities of daily living." (See id.; see also Tr. at 52.) It seems to me, however, that it was appropriate for the ALJ to give reduced weight to Dr. Schroeder's opinion in light of other evidence in the record suggesting that Magisana was not so severely limited. (See Tr. at 54 (citing, inter alia, Tr. at 437 ("Ms. Magisana denies any restrictions of activities of daily living and does not appear to have such.")))[10]

---

[10] I note parenthetically that I do not mean to suggest that Magisana's daily activities were not limited. I find merely that insofar as Dr. Schroeder opined that Magisana was "extremely limited" and does not perform any "household tasks because of fatigue and pain," (see Tr. at 446, 454), his opinion is not consistent with the record as a whole. Conversely, Dr. Jones-Thurman's opinion that Magisana has no restrictions in activities of daily living is not supported by

Finally, Magisana reviews a number of treatment notes and other documents that, in her view, establish that her fibromyalgia has been properly diagnosed, that her brief periods of improvement were "always followed by periods of severe pain . . . and increased fatigue," that stressors worsen her fibromyalgia symptoms, that she needs daily naps to compensate for her "nonrestorative night time sleep," and that she has complied with her doctors' orders.  (See Pl.'s Br. at 15-17.)  I take it that Magisana means to argue that it was improper for the ALJ to discredit Dr. Hurley's and Dr. Schroeder's opinions because Magisana claims those opinions are supported by the record.  After a careful review, however, I find that the ALJ's decision is supported by substantial evidence, and the ALJ has given good reasons for assigning relatively less weight to those opinions. I cannot reverse the decision merely because the record might also support a different outcome.  See Travis v. Astrue, 477 F.3d 1037, 1040 (8th Cir. 2007) ("If substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome.").

In summary, I am not persuaded that the ALJ erred by discounting certain opinions offered by treating and consulting witnesses.  The ALJ gave good reasons for giving reduced weight to certain opinions, and overall the medical records contain substantial evidence supporting the Commissioner's decision to do so.  The ALJ developed the medical record fully and fairly, and she did not engage in "cherry picking."

**B.    The ALJ's Decision to Discount Statements Made By Magisana and Her Husband**

Magisana argues next that the ALJ erred by discounting her statements about the nature and extent of her limitations.  (See Pl.'s Br. at 20-25, ECF No. 16.)

"The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts."  Moore v. Astrue, 572 F.3d 520, 524 (8th Cir. 2009) (quoting Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001)).  "In assessing a claimant's credibility, the ALJ must consider: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the participating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective

---

substantial evidence.

medical evidence to support the claimant's complaints." Id. (citing, inter alia, Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "An ALJ who rejects [subjective] complaints must make an express credibility determination explaining the reasons for discrediting the complaints." Id. (citation omitted) (alteration in original). The ALJ need not explicitly discuss each of the foregoing factors, however. Id. (quoting Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005)). "It is sufficient if [the ALJ] acknowledges and considers [the] factors before discounting a claimant's subjective complaints." Id. (quoting Goff, 421 F.3d at 791) (alteration in original). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so," courts "will normally defer to the ALJ's credibility determination." Jones v. Astrue, 619 F.3d 963, 975 (8th Cir. 2010) (quoting Halverson v. Astrue, 600 F.3d 922, 932 (8th Cir. 2010)).

In the instant case, the ALJ noted that when assessing Magisana's credibility, she was obligated to consider the objective medical evidence; Magisana's daily activities; the location, duration, frequency, and intensity of her pain or other symptoms; the factors that precipitate or aggravate her symptoms; the type, dosage, effectiveness, and side effects of any medication Magisana takes or has taken to alleviate pain or other symptoms; any measures other than treatment that Magisana uses or has used to relieve pain or other symptoms; and any other factors concerning Magisana's functional limitations and restrictions due to pain or other symptoms. (Tr. at 49.) She then concluded that Magisana was "not a fully credible witness" for several reasons. (Tr. at 53.)

First, the ALJ stated that Magisana was not credible because she reported to Dr. Hurley in February 2006 that "although she was still experiencing pain, the medication that she was taking seemed to help her sleep." (Tr. at 53.) Approximately ten days later, however, Magisana "told Dr. Bruner that she experienced poor sleep." (Id.) It is appropriate for an ALJ to "disbelieve a claimant's subjective reports of pain because of inherent inconsistencies or other circumstances." Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004). I find, however, that the "inconsistency" between Magisana's reports to Dr. Hurley and Dr. Bruner is too frail to justify discrediting Magisana's testimony. The record is replete with evidence that Magisana struggled with sleep for quite some time, and a single report that medication "seemed to help" does not significantly undermine Magisana's credibility.

32

Second, the ALJ noted that in July 2006, Magisana reported to Dr. Hurley that "she was having more difficulty with diffuse pain," but "she indicated that she had recently took [sic] a trip to New Orleans with her mother and children." (Tr. at 53.) The ALJ added, "Although a vacation and a disability are not necessarily mutually exclusive, the claimant's decision to go on a vacation tends to suggest that the alleged symptoms and limitations may have been overstated." (Id.) "[M]ultiple vacations," combined with other evidence of activities that "are inconsistent with a claimant's assertion of disability," do "reflect negatively upon that claimant's credibility." Renstron v. Astrue, 680 F.3d 1057, 1067 (8th Cir. 2012) (quoting Halverson v. Astrue, 600 F.3d 922, 932 (8th Cir. 2010)). Although I doubt whether a single vacation during the relevant time period is significant, I shall bear the vacation in mind as I continue to review the ALJ's reasons for discrediting Magisana.

Third, the ALJ observed that there have been long gaps in Magisana's treatment, which "seem to indicate that the claimant's symptoms are not as severe as she has been alleging." (Tr. at 53.) Specifically, the ALJ wrote that "in September 2006, [Magisana] noted that she was 'doing relatively well,' and did not return to the clinic for approximately seven months. Upon her return, she indicated she was pregnant." (Id.) The ALJ also noted that Magisana "went without treatment from Dr. Cannella for nearly a year." (Id. at 53. See also id. at 617, 651 (indicating that Magisana did not see Dr. Cannella between March 30, 2009 and April 1, 2010).) These lengthy gaps are a legitimate factor for the ALJ to consider when evaluating Magisana's subjective complaints of pain. See, e.g., Benskin v. Bowen, 830 F.2d 878, 884 (8th Cir. 1987). Where, as here, there is no indication that Magisana lacked the financial means to seek treatment more frequently, it was proper for the ALJ to infer that her pain "is not as disabling as she has alleged." (Tr. at 53.)[11] Magisana's suggestion that the gaps in her record have no bearing upon her ability to sustain full-time work, (see Pl.'s Br. at 23, ECF No. 16), is rejected.

_____

[11] The record suggests that Magisana's access to insurance affected her ability to seek treatment on two occasions, and there is a reference to a bankruptcy in 2008. (See Tr. at 329, 368, 558.) The record does not indicate, however, that the aforementioned gaps in Magisana's treatment are attributable to financial difficulties.

33

Fourth, the ALJ found that Magisana "has provided inconsistent statements regarding her activities of daily [living]." (Tr. at 54.) Specifically, the ALJ noted that Magisana told Dr. Schroeder that "she was extremely limited in her ability to perform activities," but "she later indicated that she was not as limited as she had previously indicated." (Id.) The ALJ also wrote, "Moreover, [Magisana] indicated that her medical conditions prevented her from adhering to a consistent schedule, however, evidence in the record as well as her testimony indicate that she has good management and organizational skills in that she was able to develop a schedule for her family, take care of two foster children, volunteer at church, exercise, and attend a 12-Step program for some time." (Id.) There are indeed inconsistencies in Magisana's descriptions of her daily activities. (Compare Tr. at 437 ("Ms. Magisana reports that she takes her children to their appointments or to her own appointments during the day . . . . She irons everyone's clothes so they are ready to go, and does the dishes. She does some laundry . . . .") with Tr. at 446 ("She is no longer able to help [her children] with their homework or bring them to activities . . . She . . . reports she does not do any laundry or perform other household tasks because of fatigue and pain . . . .")[12].) Moreover, and as I noted above, it is appropriate for an ALJ to "disbelieve a claimant's subjective reports of pain because of inherent inconsistencies." Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004). It seems to me, however, that apart from Dr. Schroeder's report, the discrepancies in Magisana's descriptions of her limitations are relatively minor. The inconsistencies provide only a slight basis for doubting Magisana's testimony.

Next, the ALJ wrote,

> [Magisana] is a busy mother to six children, has had a baby shortly before she quit work and has delivered another child since she applied for disability and taken on foster care responsibilities for two other children. Clearly she has a busy family life, but her alleged limitations are inconsistent with the level of activities of daily living and objective evidence; she drives a car, travels by plane with four children, does household chores; her day starts at 630 am and she still finds time to volunteer at the church doing clerical activities.

(Id. at 54.) It is true that "acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility." Renstrom v. Astrue, 680 F.3d 1057, 1067 (8th Cir.

---

[12] As noted previously, both of these records are dated January 2008.

34

2012) (quoting <u>Halverson v. Astrue</u>, 600 F.3d 922, 932 (8th Cir. 2010)).  It seems to me, however, that in some respects the ALJ has slightly overstated Magisana's "level of activities of daily living." Magisana only once traveled by plane with her children, yet the ALJ's review implies that she does so regularly.  Also, it is misleading for the ALJ to suggest, without qualification, that Magisana "does household chores."  Although there is some inconsistency in the record regarding the chores that Magisana is able to complete, a fair reading of the evidence reveals that she is only able to complete certain tasks around the house.  <u>See</u> <u>Reed v. Barnhart</u>, 399 F.3d 917, 923 (8th Cir. 2005) (noting that the Eighth Circuit "has repeatedly observed that the ability to do activities such as light housework and visiting with friends provides little or no support for a finding that a claimant can perform full-time competitive work").  Nevertheless, it is quite true that Magisana drives regularly, performs household chores, has served as the primary caregiver for her four children, and has also cared for two foster children for a time.  On the whole, and after careful consideration of the record, I find that it was appropriate for the ALJ to discount Magisana's subjective complaints in light of her activities of daily living.  <u>See, e.g.</u>, <u>Pena v. Chater</u>, 76 F.3d 906, 908 (8th Cir. 1996) ("Substantial evidence supports the administrative law judge's decision to discount Pena's testimony.  Pena testified that he was able to care for at least one of his six children on a daily basis, drive a car when unable to find a ride, and sometimes go to the grocery store.").

The ALJ also found that Magisana's credibility was diminished because "the overall record shows a very limited number of complaints that [Magisana] has had regarding the use of [her hands] and there has been no documented treatment specifically for her hands."  (Tr. at 54.)  The ALJ conceded, however, that Magisana "may have some difficulty using her hands," (<u>id.</u>), and it is not clear to me that Magisana has claimed that her hands caused her any significant limitations.  In short, I fail to see why Magisana was discredited based on the ALJ's observations about her hands.

Earlier in her decision, the ALJ noted that Magisana's "statements concerning the intensity, persistence, and limiting effects of [her symptoms] are not credible to the extent they are inconsistent with the . . . residual functional capacity assessment" because medical records do not support her statements.  (Tr. at 50; <u>see also</u> <u>id.</u> at 50-53.)  In particular, the ALJ cited Dr. Bruner's finding that Magisana "did not appear to be in any distress and appeared 'non-ill'"; that she "moved somewhat slowly in an effort to convince him that she was in pain"; that she moved about the examination

35

room with little difficulty; and that despite her complaints of significant pain, she was only taking etodolc and amitriptyline.  (Id. at 50-51.)  The ALJ noted that Dr. Schroeder found that Magisana "was not in any apparent distress" even though "she groaned when moving about the exam room." (Id. at 51-52.)  She also cited records indicating that Magisana was able to exercise, that her treatment had been relatively conservative, and that there have been few findings of abnormalities apart from trigger-point tenderness.[13]  (Id. at 50-52.) Finally, the ALJ cited the medical consultant's opinions that Magisana was capable of performing "light exertional level work."  (Id. at 53.) Although "an ALJ may not discount a claimant's subjective complaints solely because the objective medical evidence does not fully support them," Wiese v. Astrue, 552 F.3d 728, 733 (8th Cir. 2009), an ALJ may consider "the absence of objective medical evidence to support the claimant's complaints" when assessing her credibility, Moore v. Astrue, 572 F.3d 520, 524 (8th Cir. 2009) (citing, inter alia, Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)).  After carefully reviewing the entire record, I find that the ALJ properly concluded that Magisana's testimony was not fully credible because the severity of her alleged limitations was not consistent with medical evidence.

In summary, I find that the ALJ properly discredited Magisana's statements insofar as those statements describe limitations beyond those that were incorporated into the RFC determination. The ALJ was required to make an express determination of Magisana's credibility, and the ALJ satisfied her obligation by writing a thorough analysis of the record and discussing in detail the factors that undermined Magisana's credibility.  As I have noted, not all of the factors cited by the ALJ are adequate to support her decision to discredit Magisana.  Nevertheless, it was appropriate for the ALJ to discount Magisana's statements based upon 1) the inconsistency between the severity of Magisana's subjective complaints and the objective medical evidence (which includes relatively benign examination findings and conservative treatment), 2) the gaps in Magisana's treatment for fibromyalgia, and 3) the inconsistency between the severity of Magisana's self-reported symptoms and her activities.  Inconsistencies in Magisana's statements to her physicians also provide relatively

---

[13] As I noted previously, there is little evidence that Magisana demonstrated pain on range of motion, limited range of motion, weakness, synovitis, or difficulties sitting, walking, or concentrating during examinations.  Imaging and sleep studies also revealed no abnormalities.

slight support for the ALJ's credibility determination.  Because the ALJ gave good reasons for discounting Magisana's credibility, I must "defer to the ALJ's credibility findings."  Renstrom, 680 F.3d at 1067.

Magisana argues that each of the Polaski factors weighs in favor of a finding that she is credible.  Specifically, she states that her "testimony about her daily activities . . . totally coordinates with her reports to both treating and consultant physicians"; that two treating sources state that "she is not a malingerer"; that the duration and intensity of her pain is consistent with her diagnosis; that "periods of temporary relief were always followed by a return of symptoms"; that "[i]ncreased stressors (whether physical or mental) always caused a spike in physical symptoms," that the record "supports Dr. Hurley's conclusion that symptoms would cause absences from a job at least three days per month"; that she has been compliant with a regimen of medications . . . as well as attempts at exercise and physical therapy," and treating and consulting physicians have made statements about her functional restrictions.  (Pl.'s Br. at 20-21, ECF No. 16.)  Some of Magisana's points are well-taken,[14] but even in combination they do not undermine the fact that the ALJ gave good reasons for finding that Magisana was not fully credible.

Magisana also argues that "the unique nature of fibromyalgia" must be taken into account, and she emphasizes that other courts have held that the symptoms of fibromyalgia can prevent a person from working.  (Pl.'s Br. at 21, ECF No. 16.)  In support of her argument, Magisana refers me to Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998).  In Kelley, the Eighth Circuit found that

---

[14] Many of Magisana's points are not supported by the record, however.  For the reasons explained above, Magisana's testimony about her daily activities does not "totally coordinate[]" with the reports she made to physicians, and there are clear discrepancies in those reports.  Also, it is not clear that the record supports Dr. Hurley's conclusion that Magisana's symptoms would cause her to miss work more than three days per month.  Although the record shows that Magisana did occasionally follow her physician's instructions to exercise and that her symptoms improved when she did so, it cannot be said that she was fully compliant with her exercise regimen.  The record also shows that Magisana abandoned physical therapy before completing it, despite experiencing early gains.  Finally, though it is true that two of Magisana's physicians indicated that she was not malingering, Dr. Bruner noted that Magisana appeared to be trying to convince him that she was experiencing pain, that her antalgic gait was "questionable" and "inconsistent," and that she was able to sit during the examination for a far longer time than she claimed she was capable of doing.

the claimant's case must be remanded to the Commissioner because, inter alia, the ALJ improperly discredited the claimant's claim that fibromyalgia caused her to experience disabling pain.  The court explained,

> Although a claimant's allegations of disabling pain may also be discredited by evidence that the claimant has received minimum medical treatment and/or taken only occasional pain medications, such is not the case with Kelly.  Again, the record shows numerous visits to doctors.  She testified that she takes many prescription medications.  She has availed herself of many pain treatment modalities, including a TENS unit, physical therapy, trigger point injections of cortisone, chiropractic treatments, and nerve blocks.  In addition, she has had several surgeries and many diagnostic tests, including X-rays, CT scans, DNA tests, MRI's, and blood work.

Id. (citation and footnote omitted).  Kelley does stand for the general proposition that fibromyalgia can render a claimant unable to engage in substantial gainful activity.  It does not follow, however, that every diagnosis of fibromyalgia results in the same degree of limitation, or that benefits must be awarded whenever such a diagnosis is made.  Indeed, Kelley is distinguishable from the instant case in several respects.  Like the claimant in Kelley, Magisana did visit doctors and take prescription medications, but there were significant gaps between some of Magisana's treatment visits.  Magisana did attempt physical therapy and appeared to obtain benefits from it, but she quit attending her sessions prematurely.  None of Magisana's diagnostic tests revealed any abnormalities, and she was never referred for surgery or provided with trigger point injections, nerve blocks, or a TENS unit.  On the whole, it seems to me that Kelley lends support to the ALJ's finding that Magisana received relatively conservative, infrequent treatment given the limitations she claims to have been suffering.

Magisana argues next that her "minimal daily activities, including the care of her children, did not justify the ALJ's rejection of her statements regarding the intensity and duration of her pain and fatigue.  (Pl.'s Br. at 22, ECF No. 16.  See also id. at 24 ("Short term activities, such as travel, undertaken despite pain, do not mean a claimant could concentrate on assigned work or do a similar activity on a full time basis.").)  In support of her argument, she refers me to Cline v. Sullivan, 939 F.2d 560, 566 (8th Cir. 1991), wherein the court noted that "an SSI claimant need not prove that she is bedridden or completely helpless to be found disabled."  (See Pl.'s Br. at 22, ECF No. 16.  See also id. at 25.)  In Cline, however, the ALJ discussed only the claimant's part time employment and

38

failed to mention any other daily activities that might be inconsistent with her subjective allegations of pain.  The court studied the record and concluded that the claimant's daily activities were consistent with her allegations of disabling pain, stating,

> Appellant is unable to wash her own hair without her husband's assistance. Appellant can drag, but not lift a gallon container.  Driving an automobile requires all of appellant's residual physical strength to control the car so appellant restricts her driving to short trips to the grocery store.  When grocery shopping, appellant must pull rather than push her grocery cart.  For transportation to the hospital, appellant relies on the hospital's service car.  Appellant prepares meals at home, although she experiences pain using small kitchen appliances.  Throughout the remaining hours of her days, the record does not reflect that appellant engages in any recreational or other activity even remotely strenuous which is inconsistent with her allegations of pain.

Id. (citations omitted).  Thus, in Cline the ALJ erred by failing to identify and discuss any activities of daily living which were inconsistent with the claimant's subjective complaints of disabling pain. In the instant case, however, the ALJ did not commit this error.  On the contrary, she cited a number of Magisana's activities that indicate that her mental and physical capabilities are greater than she claims.  See Edwards v. Barnhart, 314 F.3d 964, 966-67 (8th Cir. 2003) (distinguishing Cline for similar reasons).

I agree that Magisana need not show that she is "completely helpless" or bedridden to establish that she is unable to work.  I also agree that, as a general matter, evidence that a person can do occasional light housework provides little support for the proposition that she can perform full-time, gainful employment.  (See Pl.'s Br. at 24-25, ECF No. 16 (citing several cases).)  In this case, however, neither the ALJ's RFC finding nor her decision to discount Magisana's subjective complaints were based solely on evidence about Magisana's activities of daily living.  As explained above, Magisana's activities provide some support for the ALJ's credibility determination, but the ALJ's decision is properly supported by other factors as well. This distinguishes the instant case from each of those cited by Magisana.

Next, Magisana concedes that "[a]n ALJ may consider inconsistencies between a Plaintiff's statements and the evidence in the medical record . . . [when] evaluating credibility," but she claims that "there are no inconsistencies" in her records.  (Pl.'s Br. at 22, ECF No. 16.)  Her argument is belied by the examples of inconsistencies cited in the ALJ's decision.  In addition, and as explained

previously, the conservative treatment reflected in the medical records and the gaps in Magisana's treatment are also inconsistent with Magisana's claims of severe limitations.

Finally, Magisana argues that the ALJ erred by discrediting Magisana's husband's statement. (Pl.'s Br. at 23-24, ECF No. 16.)  After summarizing the contents of Mr. Magisana's statement, the ALJ wrote,

> The undersigned has not given great weight to the statements of Mr. Magisana.  Out of natural concern and devotion it is not uncommon for family members to place unreasonable limitations on the activities of a loved one, or to attribute even ordinary changes in mood to an impairment, whenever illness or injury occurs.  Clearly, Mr. Magisana was concerned about the claimant's well-being; however, his allegations that the claimant is as limited as indicated in his statements is not consistent with the overall record.

(Tr. at 53.)  Magisana argues that "[i]t is error to reject the testimony of a claimant or the claimant's family members as inherently self-serving."  (Pl.'s Br. at 24, ECF No. 16 (quoting Hocij v. Shalala, No. 8:96CV338 (D. Neb. March 31, 1998)).)  Although the ALJ did suggest that Mr. Magisana's statements were likely biased by his "concern and devotion," she discounted his statements about the extent of Magisana's limitations because they were "not consistent with the overall record."  (Tr. at 53.)  Although it would have been preferable for the ALJ to specifically articulate the reasons underlying her finding that Mr. Magisana's statements were not fully credible, this shortcoming does not warrant reversal because Mr. Magisana's statements merely corroborate Magisana's; therefore, they may be discredited based on the same evidence that supports the ALJ's conclusion that Magisana's statements are not fully credible.  See Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000); see also Black v. Apfel, 143 F.3d 383, 387 (8th Cir. 1998) ("The ALJ, having properly discredited Black's complaints of pain, was equally empowered to reject the cumulative testimony of her parents.").

For the foregoing reasons, I find that the ALJ did not err by concluding that Magisana and her husband did not make fully credible statements about the extent of Magisana's limitations.

### C.   The ALJ's Analysis of Magisana's Depression

Magisana argues that the ALJ erred at step two of the sequential analysis by concluding that Magisana's depression was not a severe impairment.  (Pl.'s Br. at 25-27, ECF No. 16.)

40

As noted above, step two requires an ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. § 404.1520(c); id. § 416.920(c).  A "severe impairment" is an impairment or combination of impairments that significantly limits the claimant's ability to do "basic work activities and satisfies the "duration requirement."  See 20 C.F.R. § 404.1520(a)(4)(ii), (c); id. § 404.1509 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months."); id. § 416.920(a)(4)(ii), (c); id. § 416.909.  An impairment is considered "not severe" if it is "a slight abnormality . . . that has no more than a minimal effect on the ability to do basic work activities."  SSR 96-3p, 1996 WL 374181. at *1 (July 2, 1996).

The ALJ concluded that Magisana's fibromyalgia was a severe impairment, but that her hypertension, irritable bowel syndrome, abdominal pain, depression, general anxiety disorder, and panic disorder were not severe.  (Tr. at 44-47.)  When analyzing the severity of Magisana's mental impairments, the ALJ reviewed the relevant treatment notes, Magisana's history of GAF scores, the opinions of consultants Dr. Jones-Thurman, Dr. Milne, and Dr. Brayman, and the opinions of treating source Dr. Ogunleye.  (Id. at 45-47.)  She then considered "the four broad functional areas set out in the disability regulations for evaluating mental disorders" and in 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 12.00(C), and concluded that Magisana's mental impairments, singly and in combination, caused mild limitations in Magisana's activities of daily living; "no limitations to mild limitations" in her social functioning; no limitations in concentration, persistence, or pace; and no episodes of decompensation of extended duration.  (Tr. at 47.)  Each of these findings is supported by substantial evidence.  (See id. at 45-47 (citing, inter alia, Dr. Jones-Thurman's findings that Magisana had no restrictions in activities of daily living, no difficulties in maintaining social functioning, and "no recurrent episodes of deterioration when stressed which could result in withdrawal from the situation or an exacerbation of symptoms; Dr. Ogunleye's findings that Magisana had no restrictions in activities of daily living, no limits in social functioning, and his failure to identify any problems with concentration, persistence, or pace, or periods of decompensation; and Dr. Milne's and Dr. Brayman's findings that Magisana had mild restrictions in activities of daily living, no difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation).)  The ALJ then found that because her "medically

determinable mental impairments cause no more than 'mild' limitation in any of the first three functional areas and 'no' episodes of decompensation which have been of extended duration in the fourth area, they are nonsevere."   (Id. at 47 (citing 20 C.F.R. § 404.1520a(d)(1), 20 C.F.R. § 416.920a(d)(1)).)

Magisana first implies that the ALJ violated SSR 85-28, 1985 WL 56856 (1985), when she concluded that Magisana's depression was not a severe impairment.  In pertinent part, SSR 85-28 states, "Great care should be exercised in applying the not severe impairment concept.  If an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation process should not end with the not severe evaluation step.  Rather, it should be continued."  1985 WL 56856, at *4. As the Commissioner correctly notes, however, Magisana's reliance upon SSR 85-28 is misplaced. (See Def.'s Response Br. at 17, ECF No. 19.)  Because "the ALJ assessed the severe impairment of fibromyalgia, and did not terminate the sequential evaluation at step two, this case did not involve the situation that Ruling 85-28 describes."  (Id.)

Magisana also argues that because her "depression is a 'medically determined impairment'" that limited "her ability to cope mentally and emotionally with the demands of everyday life," it was erroneous "for the ALJ to exclude the effect of depression when formulating the RFC and questioning the VE."  (Pl.'s Br. at 26, ECF No. 16.)  It is true that the ALJ found that Magisana's depression, along with her other mental impairments, were "medically determinable."  (Tr. at 45.) As explained above, however, the ALJ's conclusion that Magisana's medically determinable mental impairments were "not severe" is supported by the record.  Moreover, there is no indication that the ALJ disregarded the mild effects of Magisana's depression when formulating her RFC.  (See Tr. at 49-50 (noting that Magisana alleged that she was unable to sustain work due to fibromyalgia, depression, and anxiety, and that Magisana's depression fluctuates along with the severity of her fibromyalgia symptoms).)

Magisana has not persuaded me that the ALJ erred when analyzing the evidence of her depression and other mental impairments.

**IT IS ORDERED** that the Commissioner of Social Security's decision is affirmed.

Dated August 29, 2012.

BY THE COURT

Warren K. Urbom
United States Senior District Judge